1   ANNE WANG (CA BAR NO. 151000)
2   awang@lewisroca.com
    DREW WILSON (CA BAR NO. 283616)
3   dwilson@lewisroca.com
4   LEWIS ROCA ROTHGERBER CHRISTIE LLP
    655 North Central Avenue, Suite 2300
5   Glendale, CA 91203-1445
6   Telephone: (626) 795-9900

7   LANCE G. JOHNSON (Admitted *Pro Hac Vice*)
8   lance@lgjlegal.com
    JOHNSON LEGAL PLLC
9   12545 White Drive
10  Fairfax, VA 22030-6413
    Telephone: (202) 445-2000
11  Facsimile: (888) 492-1303
12
    Attorneys for Defendant
13  CREATEDHAIR DESIGNS, LLC
14
15
16              UNITED STATES DISTRICT COURT FOR THE
17               CENTRAL DISTRICT OF CALIFORNIA
18
    NG IMPORTS INC.,                    | Case No.: 2:21-cv-08086-JAK-RAO
19
                Plaintiff,              | **OPENING CLAIM
20                                      | CONSTRUCTION BRIEF
21  vs.                                 | FOR DEFENDANT**
22  CREATEDHAIR DESIGNS, LLC,           |
23                                      | **Hon. John A. Kronstadt**
                Defendant.              |
24
25
26
27
28

117329396.4

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.   INTRODUCTION ................................................................. 1

II.  BACKGROUND INFORMATION ........................................... 2

    a.   The Product Is An Accessory for Wig Users ................................. 2

    b.   Overview of the Disclosures ................................................. 3

    c.   The Language of the Asserted Claims ........................................... 5

    d.   The Prosecution History ...................................................... 7

III. LEGAL STANDARDS OF CLAIM CONSTRUCTION ..................... 12

    a.   In General ....................................................................... 12

    b.   The Specification Can Provide Meaning to Odd Terms
       or Surrendered Claim Scope ........................................... 14

    c.   The Prosecution History Can Help Illuminate Meaning
       and Surrender ................................................................ 14

    d.   Extrinsic Evidence is a Last Resort .......................................... 16

    e.   Claim Terms Must Be Construed Consistently Across Claims
       and Related Patents ....................................................... 16

IV.  THE CLAIM PHRASE FOR CONSTRUCTION ............................... 17

    a.   The claims literally require that all the components
       of "the wig grip apparatus" must terminate at the
       "forward periphery" of the mesh element.
       None may extend beyond it........................................... 17

    b.   The specification and drawings support CHD's
       proposed construction .................................................. 17

    c.   The Prosecution History Supports CHD's Construction ............. 18

    d.   The Examiner's Reasons for Allowance Support
       CHD's Construction..................................................... 20

-i-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

e.    CHD's proposed construction also complies
with the doctrine of claim differentiation....................................20

f.    NGI's Course of Dealing Supports CHD's
Proposed Construction ................................................21

V.   CONCLUSION.........................................................................21

117329396.4

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3M Innovative Properties Co. v. Tredegar Corp.,*
  725 F.3d 1315 (Fed. Cir. 2013) ....................................................................14

*Am. Piledriving Equip. v. Geoquip, Inc.,*
  637 F.3d 1324 (Fed. Cir. 2011) ....................................................................14

*Bicon, Inc. v. Straumann Co.,*
  441 F.3d 945 (Fed. Cir. 2006) .....................................................................13

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.,*
  535 U.S. 722 (2002).............................................................................. 15, 20

*Genuine Enabling Tech. LLC v. Nintendo Co.,*
  29 F.4th 1365 (Fed. Cir. 2022) ....................................................................13

*Haemonetics Corp. v. Baxter Healthcare Corp.,*
  607 F.3d 776 (Fed. Cir. 2010) .....................................................................12

*Hoganas AB v. Dresser Indus., Inc.,*
  9 F.3d 948 (Fed. Cir. 1993) ................................................................... 13, 15

*Hughes Aircraft Co. v. U.S.,*
  717 F.2d 1351 (Fed.Cir.1983) .....................................................................15

*Kumar v. Ovonic Battery Co.,*
  351 F.3d 1364 (Fed. Cir. 2003) ....................................................................12

*Markman v. Westview Instruments, Inc.,*
  517 U.S. 370 (1996)....................................................................................12

*MeadWestVaco Corp. v. Rexam Beauty and Closures, Inc.,*
  731 F.3d 1258 (Fed. Cir. 2013) ....................................................................13

*Netword, LLC v. Centraal Corp.,*
  242 F.3d 1347 (Fed. Cir. 2001) ....................................................................14

*NTP, Inc. v. Research In Motion, Ltd.,*
  418 F.3d 1282 (Fed. Cir. 2005) ....................................................................16

117329396.4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Omega Eng'g, Inc, v. Raytek Corp.*,
  334 F.3d 1314 (Fed. Cir. 2003) ........................................................16

*Pall Corp. v. Micron Separations, Inc.*,
  66 F.3d 1211 (Fed. Cir. 1995) ........................................................16

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) ............................................... 12, 13

*Sumitomo Dainippon Pharma Co. v. Emcure Pharms. Ltd.*,
  887 F.3d 1153 (Fed. Cir. 2018) ............................................... 14, 16

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
  135 S. Ct. 831 (2015).....................................................................12

*Thorner v. Sony Comput. Entm't Am. LLC*,
  669 F.3d 1362 (Fed. Cir. 2012) ......................................................14

*Traxcell Techs., LLC v. Nokia Sols. & Networks Oy*,
  15 F.4th 1136 (Fed. Cir. 2021) ......................................................15

*Unique Concepts, Inc. v. Brown*,
  939 F.2d 1558 (Fed.Cir.1991) .......................................................13

*Vitronics Corp. v. Conceptronic, Inc.*,
  90 F.3d 1576 (Fed. Cir. 1996) ......................................................15

*Wang Laboratories, Inc. v. Mitsubishi Electronics America, Inc.*,
  103 F.3d 1571 (C.A.Fed.1997).......................................................16

**Statutes**

35 U.S.C. §120..................................................................................3

117329396.4

## I.   **INTRODUCTION**

In this action, Plaintiff NG Imports ("NGI") has accused Defendant CreatedHair Designs, LLC ("CHD") with infringement of claims 1, 2, 10, 11, 14, 20, and 21 (claims 1 and 20 are independent claims) of U.S. Patent No. 10,881,159 ("the '159 Patent" attached as Exhibit 1) and claims 1 and 2 of U.S. Patent No. 10,945,477 ("the '477 Patent" attached as Exhibit 2) as well as design patent U.S. D879,382 ("the '382 Patent"). The parties have agreed to raise the appropriate scope of the '382 Patent in the context of an anticipated motion for summary judgment, leaving just the '159 and '477 utility patents for construction.

The '159 and '477 patents have "essentially identical" disclosures and the same, key phrase, used in the Asserted Claims. Plaintiff has agreed that the same constructions and specification references will apply to both the '159 and '477 patent claim terms. (Dkt 34 at 2-3 n.1.)

The parties have been unable to agree on the construction of just one key phrase that appears in the Asserted Claims of the '159 and '477 patents: "the wig grip apparatus terminates at the forward periphery." This meaning and scope of this phrase is at the heart of any determination of literal infringement and, in light of the events reflected by the prosecution history, for any determination of estoppel and infringement under the doctrine of equivalents.

CHD's proposed construction of "the first securement member, second securement member, and mesh element all terminate at the forward periphery of the mesh element such that the securement members may not extend beyond the forward periphery of the mesh element" is based on the intrinsic evidence, e.g., the literal language and linguistic structure of the claims, the underlying disclosure (specification and drawings), the written record of the prosecution history that produced to the disputed language, and the references considered by the examiner.

NGI's proposed construction would ask the Court to disregard the literal language of the claims and interject  broadening terms that are not supported by

-1-

the language of the claims or the intrinsic evidence. Such a construction is both contrary to the public notice functions of claims as well as Supreme Court and the Court of Appeals for the Federal Circuit controlling precedent for the construction of patent claims.

## II.   BACKGROUND INFORMATION

### a.  The Product Is An Accessory for Wig Users

Wigs are part of a carefully designed illusion whose value lies in concealment of the wig, per se, but to appear as the user's natural hair. Wigs are extensively used in the entertainment industry to allow actors to portray different roles without changing their natural hair. Wigs also serve an important role in restoring the self-esteem and confidence of users, men as well as women, who suffer partial or complete hair loss from alopecia. For those afflicted, the need for a well fit, completely undetectable, wig is an essential component of their daily lives.

If others can detect the telltale signs of a wig, however, the discovery will destroy the intended illusion, often to the embarrassment of the user. Concealment is especially important at the user's natural hair parting line where the separated hair allows the user's skin to show through.

Even with a well fitted wig, a number of factors can cause a wig to move out of place. A number of products are available to help hold a wig in place. Typical techniques include wig caps, wig adhesives, wig tapes (double-sided adhesive tapes), and clips of various sizes that anchor the wig to the user's existing hair. These techniques all have their drawbacks.

In about 2017, velvet wig bands came on the market as an accessory to help hold a wig both comfortably and securely. These velvet wig bands use a solid band of directional, velvet fabric on both sides and engageable, hook-and-loop closure elements. The Velcro closure allow each user to adjust the band for a comfortable,

snug, fit for each user. These wig bands solved a number of problems with the alternative methods.

The Accused Product is a wig grip band like the conventional bands but with a piece of see-through silk in the central portion of the velvet band.  This silk provides a window at the parting line that helps maintain the illusion that the hair is real.

The silk portion of the Accused wig band is set back from the forward and rearward edges of the adjacent straps. CHD found that this positioning was needed to ensure that the silk fabric could not be seen by persons standing close or by a camera that might zoom in for a tight shot. A silicone strip set into one side of each of the opposing straps provides enhanced gripping effects along the straps without adding bulk.



*Figure 1 - The Accused Product*

**b.  Overview of the Disclosures**

The Asserted Patents are related under 35 U.S.C. §120 in that the '159 Patent (Exh. 1) is a divisional patent of the '477 patent (Exh. 2). The '159 Patent claims are directed to the wig band, itself, while the '477 Patent is directed to a method of using this wig band to hold a wig on a user. The disclosures are the same, and the language describing the band is essentially the same between the '159 and '477 Patents.

In the '159 and '477 patents, only two types of embodiments are shown in figures 1-2 and figures 3-9:

-3-





**FIG. 1**

**FIG. 5**

(Reference 132 is the "forward periphery" of mesh element 120. Securement members 108, 114 have "forward edge" 126. (2:63-65.))

Both of these embodiments show a mesh portion aligned with the edges of the adjacent side bands. Such alignment is also described in lines 10-12 the Abstract:[1]

> The **securement members each include a forward edge** and an opposing rearward edge. The mesh element may include a frontal segment having a forward periphery. **The forward periphery is preferably in alignment with the forward edges.**

---

[1] Unless otherwise noted, emphasis has been added to quoted text.

117329396.4

An equivalent description of the invention is found in the specification at 2:65-3:1.

No embodiment is described in which the forward periphery 126 of the mesh element extends beyond, or is recessed from, the forward edges 108, 114 of the adjacent straps.

### c. <u>The Language of the Asserted Claims</u>

Claim 1 of the '159 Patent (Exh. 1) reads:

1.  A wig grip apparatus for facilitating enhanced securement of a wig to the head of a wearer, <u>the wig grip apparatus comprising</u>:
       a first securement member comprised of velvet or velour and having a first outboard portion and a first inboard portion disposed oppositely of one another;
       a second securement member comprised of velvet or velour and having a second outboard portion and a second inboard portion disposed oppositely of one another; and
       a mesh element being transparent and affixed between the first inboard portion and the second inboard portion;
wherein the first outboard portion and second outboard portion are configured to be placed into releasable gripping engagement with one another; and
       wherein
       (a) the first securement member, the second securement member and the mesh element collectively form a band configured to encircle a head of a wearer when the first outboard portion and second outboard portion are in said releasable gripping engagement with one another;
       (b) the mesh element includes a forward periphery extending from the first inboard portion to the second inboard portion; and
       (c) <u>the wig grip apparatus terminates at the forward periphery</u>.

Claim 20 of the '159 Patent (Exh. 1) reads:

20.  A wig grip apparatus for facilitating enhanced securement of a wig to the head of a wearer, <u>the wig grip apparatus comprising</u>:

-5-

a first securement member comprised of a velvet or velour and having a first outboard portion and a first inboard portion disposed oppositely of one another;

a second securement member comprised of a velvet or velour and having a second outboard portion and a second inboard portion disposed oppositely of one another; and

a mesh element being transparent and affixed to the first inboard portion and the second inboard portion;

wherein the first outboard portion and second outboard portion are in mutual engagement for securing the wig grip apparatus around the head of the wearer; and

wherein

(a) the first securement member, the second securement member and the mesh element collectively form a band configured to encircle a head of a wearer;

(b) the mesh element includes a forward periphery extending from the first inboard portion to the second inboard portion; and

(c) <u>the wig grip apparatus terminates at the forward periphery</u>.

Claim 1 of the '477 Patent (Exh. 2) reads:

1.  A method of using a wig grip apparatus for facilitating enhanced securement of a hairpiece to the head of a wearer, the method comprising:

providing a <u>wig grip apparatus comprising</u>

(a) a first securement member comprised of a velvet or velour and having a first outboard portion and a first inboard portion disposed oppositely of one another;

(b) a second securement member comprised of a velvet or velour and having a second outboard portion and a second inboard portion disposed oppositely of one another; and

(c) a mesh element being transparent and affixed to the first inboard portion and the second inboard portion, wherein the mesh element includes a forward periphery and <u>the the wig grip apparatus terminates at the forward periphery</u>;

securing the wig grip apparatus to the head of the wearer; and applying a hairpiece having a foundation to the head, whereby the wig grip apparatus is disposed between the head and the foundation.

-6-

Importantly, each of the independent claims in each patent defines the phrase "the wig grip apparatus" as having three components (the first and second securement members plus a mesh element) and then specifies that it is this defined "wig grip apparatus" that "terminates at the forward periphery" of the mesh. The three elements of the "wig grip apparatus" must, therefore, all terminate at the "forward periphery" of the mesh element such that the forward ends of the adjacent straps do not extend beyond the "forward periphery" of the mesh.

### d. **The Prosecution History**

Claim 1, as-filed (Exhibit 3 at NGI00205), included claims that broadly claimed the structure of the band and did not require any particular positioning of the mesh element relative to the securement members other than being "affixed" between them. Original claim 1 read:

> 1. A wig grip apparatus for facilitating enhanced securement of a wig to the head of a wearer, the wig grip apparatus comprising:
> a first securement member comprised of a flexible fabric and having a first outboard portion and a first inboard portion disposed oppositely of one another;
> a second securement member comprised of a flexible fabric and having a second outboard portion and a second inboard portion disposed oppositely of one another; and
> a mesh element being transparent and affixed to the first inboard portion and the second inboard portion;
> wherein the first outboard portion and second outboard portion are configured to be placed into releasable gripping engagement with one another.

Original claim was refused by the Examiner in an Official Action dated June 12, 2020. Among other things, the Examiner cited US Patent No. 5,806,535 to Becker, as providing a wig grip band, annotated by the Examiner as:

-7-

117329396.4



FIG. 9

Becker did not show a transparent central mesh element. In that regard, the Examiner cited US Patent No. 9,486,023 to Kim et al. for a wig foundation apparatus using several longitudinal transparent mesh sections providing transparent areas for parting the hair of the wig. In the Official Action, the Examiner showed how the Becker structure could be modified with the transparent part sections of Kim as:



The examiner held that making a mesh section transparent would have been obvious to hide the band (Exh. 3 at NGI0062):

> It would have been obvious to one of ordinary skill in the art before the effective filing date of the claimed invention, to modify the transparency of the mesh element as taught by Becker to be transparent in order to make the lace essentially invisible and virtually undetectable when work to increase the aesthetic and natural looking appearance of the hair piece being worn.

The prosecution is clear that the examiner was not going to allow the original claim for a wig grip that only broadly required a transparent mesh element between adjacent straps. The examiner made that point eminently clear in her first

117329396.4

action rejection for obviousness. NGI would have to add more details to the claims to gain allowance.

In response to the rejection (Exh. 3 at NGI00043), the applicant's attorney requested an interview with the Examiner and submitted a Proposed Agenda with a proposed amendment to pending claim 21 with language specifying that the securement members (straps) would be in alignment with the front edge of the mesh element  (Exh. 3 at NGI00045):

> … a mesh element being transparent and affixed [[to]] between the first inboard portion and the second inboard portion;
> wherein
> (a) the first outboard portion and second outboard portion are in mutual engagement for securing the wig grip apparatus around the head of the wearer,
> ***(b) the securement members include a forward edge: and***
> ***(c) the mesh element extends to the forward edge***.

The interview was held on July 21, 2020. The Examiner's summary of the interview reiterated a position that the prior art rendered obvious the broad use of a transparent foundation or color to hide the wig grip (Exh. 3 at NGI00043):

> Attorney briefed Examiner about general state of the art and how instant invention is asserted to be distinguished from prior art. The purpose of a wig grip band is [to]create friction and the mesh used in wig is relatively slippery on the head such that modifications of wig grip bands would detract from their purpose of frictional engagement. Additionally, the forward position of the wig grip is where frictional engagement is needed the most. ***In the prior art, the two primary ways of making the front of the wig transparent is by replacing a wig grip with a transparent wig foundation or providing wig grips with color to match skin tone***. Attorney also noted secondary considerations of counterfeits in the market.
>
> Attorney noted Walsh and Becker as applied to independent claims and ***discussed the extension of the middle mesh section of the instant invention to the forward edge of the wig grip apparatus as a distinguishing feature***.

-9-

117329396.4

and

> Examiner noted areas of detail regarding the overall shape of the wig grip apparatus as a band with three discrete sections and details regarding not only the periphery front and rear edges of the mesh section but also details of the structure of the sides of the mesh section as they interact with and border the left and right securement members, ***specifically the shape of the center mesh section and the corresponding shapes of the inward portions of the securement members affixed to the mesh section as being pertinent areas of detail to expand upon***.

After the interview, NGI summarized the interview and amended its claims. The July 20 interview summary included:

> Applicant had presented certain proposed amendments to claim 21 and new claims 25-27 aimed to help clarify the distinctions between the prior art and the present invention. However, the Examiners explained that, in their view, the particular structure of the proposed claim language would compel a restriction requirement or raise potential 112 issues. Instead, the Examiners recommended amending the original claims to clarify the key points of distinction. The primary recommendations included clarifying that the recited components of the apparatus form a band (e.g., by way of a "wherein" clause), and possibly adding detail ***further clarifying the relationship between the transparent mesh element and the securement members***. The currently-amended independent claims 1, 16 and 21, and currently-amended dependent claims 2 and 23, are responsive to these recommendations.

The amendment to claim 1 and the other independent claims did not clarify the relationship between the mesh element and the securement members, as they had discussed. Instead, NGI presented different language to describe the mesh element (Exh. 3 at NGI00026)[2]:

---

[2] Standard USPTO practice for amendments is to strike through or double bracket terms that are removed and to underline additions.

-10-

Claim 1 (currently amended): A wig grip apparatus for facilitating enhanced securement of a wig to the head of a wearer, the wig grip apparatus comprising:

    a first securement member comprised of ~~a flexible fabric~~ velvet or velour and having a first outboard portion and a first inboard portion disposed oppositely of one another;

    a second securement member comprised of a ~~flexible fabric~~ velvet or velour and having a second outboard portion and a second inboard portion disposed oppositely of one another; and

    a mesh element being transparent and affixed [[to]] between the first inboard portion and the second inboard portion;

    wherein the first outboard portion and second outboard portion are configured to be placed into releasable gripping engagement with one another; and

    wherein
(a) the first securement member, the second securement member and the mesh
element collectively form a band configured to encircle a head of a wearer when the first outboard portion and second outboard portion are in said releasable gripping engagement with one another;
(b) the mesh element includes a forward periphery extending from the first inboard portion to the second inboard portion: and
(c) the wig grip apparatus lacks non-transparency beyond the forward periphery.

  Despite this Amendment, the Examiner found the wording, "lacks non-transparency beyond the forward periphery" to be vague, and held a second interview with the applicant's attorney on November 18, 2020. The Examiner's summary of that second interview notes:

Examiner suggested changing the language of "the wig grip apparatus lacks non-transparency beyond the forward periphery" since it was unclear as to what "lacks non-transparency" is and it was also unclear as to what was considered "beyond the forward periphery". *Both Examiner and Applicant's representative agreed to change the limitation to state "the wig grip apparatus terminates at the forward periphery" to overcome the 112 rejection and to overcome the prior art of record and put the application in condition for allowance.*

-11-

The prosecution history of the '159 Patent shows that NGI was unable to persuade the examiner to allow the claims until they were amended to specify arelationship between the mesh element and the adjacent straps in which all of these elements terminate "at the forward periphery" of the mesh element.

## III.   <u>LEGAL STANDARDS OF CLAIM CONSTRUCTION</u>

### a.   <u>In General</u>

Claim construction is "exclusively within the province of the court." *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996).

"Patent claims function to delineate the precise scope of a claimed invention and to give notice to the public, including potential competitors, of the patentee's right to exclude.  This notice function would be undermined, however, if courts construed claims so as to render physical structures and characteristics specifically described in those claims superfluous. As such, we construe claims with an eye toward giving effect to all of their terms even if it renders the claims inoperable or invalid." *Haemonetics Corp. v. Baxter Healthcare Corp.*, 607 F.3d 776, 781 (Fed. Cir. 2010) (citations omitted).

The starting point for the Court's analysis is the available intrinsic evidence relating to the patent. See *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005). Intrinsic evidence includes "the patent claims and specifications, along with the patent's prosecution history." *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015). Additionally, "prior art cited in a patent or cited in the prosecution history of the patent constitutes intrinsic evidence." *Kumar v. Ovonic Battery Co.*, 351 F.3d 1364, 1368 (Fed. Cir. 2003).

"[T]he intrinsic record must be considered and where clear must be followed. Any other rule would be unfair to competitors who must be able to rely on the patent documents themselves, without consideration of expert opinion that then does not even exist, in ascertaining the scope of a patentee's right to exclude."

-12-

*Genuine Enabling Tech. LLC v. Nintendo Co.*, 29 F.4th 1365, 1373 (Fed. Cir. 2022).

"Allowing a patentee to argue that physical structures and characteristics specifically described in a claim are merely superfluous would render the scope of the patent ambiguous, leaving examiners and the public to guess about which claim language the drafter deems necessary to his claimed invention and which language is merely superfluous, nonlimiting elaboration. For that reason, claims are interpreted with an eye toward giving effect to all terms in the claim." *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006).

"The words of the claim 'are generally given their ordinary and customary meaning,' which 'is the meaning that term would have to a person of ordinary skill in the art in question at the time of the invention.'" *MeadWestVaco Corp. v. Rexam Beauty and Closures, Inc.*, 731 F.3d 1258, 1265 (Fed. Cir. 2013) (quoting *Phillips*, 415 F.3d at 1312–13).

The patentee is responsible for the language presented in the claims. *See Hoganas AB v. Dresser Indus., Inc.*, 9 F.3d 948, 951 (Fed. Cir. 1993):

> For all the foregoing reasons, we conclude one of skill in the art, the vantage point from which the proper interpretation of the claim is ultimately determined, would not have been put on notice that the term meant other than what it says. Such a one would be perfectly justified in giving the term its ordinary meaning. If Hoganas, who was responsible for drafting and prosecuting the patent, intended something different, it could have prevented this result through clearer drafting. For example, as discussed at the hearing, the phrases 'cylindrically-shaped' or 'rod-shaped' could have been used. It would not be appropriate for us now to interpret the claim differently just to cure a drafting error made by Hoganas. That would unduly interfere with the function of claims in putting competitors on notice of the scope of the claimed invention.

*See also*, *Unique Concepts, Inc. v. Brown*, 939 F.2d 1558, 1563 (Fed.Cir.1991) ("When the language of a claim is clear, as here, and a different interpretation

-13-

would render meaningless express claim limitations, we do not resort to speculative interpretation based on claims not granted.").

### b. The Specification Can Provide Meaning to Odd Terms or Surrendered Claim Scope

There are two exceptions to the general rule that words of a claim are generally given their ordinary and customary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).

"To act as a lexicographer, the patentee must 'clearly set forth a definition of the disputed claim term.'" *Sumitomo Dainippon Pharma Co. v. Emcure Pharms. Ltd.*, 887 F.3d 1153, 1159 (Fed. Cir. 2018) (quoting CCS Fitness, Inc. v. Brunswick Corp., 288 F.3d 1359, 1366 (Fed. Cir. 2002)).

Importantly, construction of the claims cannot "enlarge what is patented beyond what the inventor has described as the invention." *Netword, LLC v. Centraal Corp.*, 242 F.3d 1347, 1352 (Fed. Cir. 2001) (upholding a narrowed construction of a claim where the disclosure in the specification is similarly limited); see also *Am. Piledriving Equip. v. Geoquip, Inc.*, 637 F.3d 1324, 1333 (Fed. Cir. 2011) (limiting the scope of the term "eccentric weight portion" to include structural elements described in the patent specification, owing to consistent reference throughout the specification to this structure as relating to the invention as a whole).

### c. The Prosecution History Can Help Illuminate Meaning and Surrender

Courts may "rely on the prosecution history to construe the meaning of the claim to be narrower than it would otherwise be" if a "patentee limited or surrendered claim scope through a clear and unmistakable disavowal." *3M*

-14-

*Innovative Properties Co. v. Tredegar Corp.*, 725 F.3d 1315, 1322 (Fed. Cir. 2013); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582-83 (Fed. Cir. 1996)).

The doctrine of prosecution history estoppel precludes a patent owner from obtaining a claim construction that would resurrect subject matter surrendered during the prosecution of his patent application. *Hughes Aircraft Co. v. U.S.*, 717 F.2d 1351, 1362 (Fed.Cir.1983).

"The essence of prosecution history estoppel is that a patentee should not be able to obtain, through the doctrine of equivalents, coverage of subject matter that was relinquished during prosecution to procure issuance of the patent. The legal standard for determining what subject matter was relinquished is an objective one, measured from the vantage point of ***what a competitor was reasonably entitled to conclude***, from the prosecution history, that the applicant gave up to procure issuance of the patent." *Hoganas AB v. Dresser Indus., Inc.*, 9 F.3d 948, 951–52 (Fed. Cir. 1993)(citations omitted).

As held in *Traxcell Techs., LLC v. Nokia Sols. & Networks Oy*, 15 F.4th 1136, 1141 (Fed. Cir. 2021):

> An applicant's argument that a prior art reference is distinguishable on a particular ground can serve as a disclaimer of claim scope even if the applicant distinguishes the reference on other grounds as well. The doctrine ensures that claims are not construed one way in order to obtain their allowance and in a different way against accused infringers. It attaches if a patentee has unequivocally disavowed a certain meaning to obtain patent in a way that is clear and unmistakable. If so, it narrows the ordinary meaning of the claim congruent with the scope of the surrender.

See also, *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 733–34 (2002):

> The doctrine of equivalents allows the patentee to claim those insubstantial alterations that were not captured in drafting the

-15-

original patent claim but which could be created through trivial changes. When, however, the patentee originally claimed the subject matter alleged to infringe but then narrowed the claim in response to a rejection, he may not argue that the surrendered territory comprised unforeseen subject matter that should be deemed equivalent to the literal claims of the issued patent. On the contrary, by the amendment the patentee recognized and emphasized the difference between the two phrases and the difference which the patentee thus disclaimed must be regarded as material.

"Prosecution history estoppel ... preclud[es] a patentee from regaining, through litigation, coverage of subject matter relinquished during prosecution of the application for the patent." *Wang Laboratories, Inc. v. Mitsubishi Electronics America, Inc.*, 103 F.3d 1571, 1577–1578 (C.A.Fed.1997).

### d. Extrinsic Evidence is a Last Resort

Extrinsic evidence, such as expert and inventor testimony, dictionaries, and learned treatises, may be considered if needed. *Pall Corp. v. Micron Separations, Inc.*, 66 F.3d 1211, 1216 (Fed. Cir. 1995); see also, *Sumitomo Dainippon Pharma Co. v. Emcure Pharm. Ltd.*, 887 F.3d 1153, 1160 (Fed. Cir. 2018) ("Extrinsic evidence is, in general, less significant than the intrinsic record in determining the legally operative meaning of claim language.")

### e. Claim Terms Must Be Construed Consistently Across Claims and Related Patents

"The patentee made a clear and unmistakable disclaimer of claim scope in its prosecution of the parent ′880 patent, and we presume, unless otherwise compelled, that the same claim term in the same patent or related patents carries the same construed meaning." *Omega Eng'g, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003). See also, *NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1293 (Fed. Cir. 2005) ("Because NTP's patents all derive from the same parent application and share many common terms, we must interpret the claims consistently across all asserted patents.").

-16-

## IV.   THE CLAIM PHRASE FOR CONSTRUCTION

| | |
|---|---|
| Disputed Claim Phrase: | "the wig grip apparatus terminates at the forward periphery" |
| NGI's Proposed Construction: | "The wig grip apparatus terminates at various locations about its entire periphery; one such location at which the wig grip apparatus terminates is at the forward periphery of the mesh element." |
| CHD'S Proposed Construction: | "The first securement member, second securement member, and mesh element all terminate at the forward periphery of the mesh element such that the securement members may not extend beyond the forward periphery of the mesh element." |

### a.   The Claims Literally Require That All Of "The Wig Grip Apparatus" Terminate At The "Forward Periphery" Of The Mesh Element. None May Extend Beyond It

The language of the Asserted Claims expressly define "the wig grip apparatus" as "comprising . . . a first securement member . . .; a second securement member . . .; and a mesh element" in which "(b) the mesh element includes a forward periphery extending from the first inboard portion to the second inboard portion. . ." Clause (c) then requires that this assembly of components ("the wig grip apparatus") "terminates at the forward periphery." Literally and grammatically, this claim language literally requires that the forward edges of the securement members be no further forward than the "forward periphery" of the mesh element.

### b.   The Specification And Drawings Support CHD's Proposed Construction

Within the '159 patent (Exh. 1), the mesh element (120) and its forward periphery (132) are shown, for example in Figs 1 and 5, as the top-most (forward) point of the apparatus:

-17-





The '159 patent describes the relationship of the side bands and the mesh element as, "The mesh element 120 may include a frontal segment 130 having a forward periphery 132, and the forward periphery 132 may preferably be in alignment with the forward edges 126." (Exh. 1 at 2:65 – 3:1.)

Going further, the specification states that "in certain embodiments, the forward periphery 132 and the forward edges 126 may collectively follow a non-linear forward pathway (see for example FIGS 1 and 2). The nonlinear forward pathway maybe arcuate or angled in some fashion." (Exh. 1 at 3:1-5.)

Thus, the combination of the forward edges of the straps and the forward periphery of the mesh may form a nonlinear path, as is depicted in figure 1, provided that the forward edge of the mesh aligns with, and terminates at, the forward edge of the mesh element.

### c.  The Prosecution History Supports CHD's Construction

As discussed, supra at pp. 9-13, the structural relationship of having the side bands terminate at the forward edge of the mesh section were brought up several

-18-

times during the prosecution after the examiner made it abundantly clear that the use of a transparent panel in a standard wig band was not patentable. (See supra at p. 9 and Exh. 3 at NGI00043, -62.)

The first suggestion is found in NGI's proposed claim amendment that was given to the examiner in advance of the first interview. See, supra at p. 10; Exh. 3 at NGI0044-45)This change in the claims was specifically discussed at the interview of July 21, 2020 as reflected by the examiner's summary of the interview (supra at p. 11; Exh. 3 at NGI 0043):

> Attorney noted Walsh and Becker as applied to independent claims and discussed the extension of the middle mesh section of the instant invention to the forward edge of the wig grip apparatus as a distinguishing feature.

After an amendment that did not adopt the structural relationship of the bands to the mesh that was suggested by the examiner, the issue again came up during the second interview of November 12, 2020 (supra at p. 12; Exh. 3 at NGI0016-17) where such a limitation was agreed upon by NGI and the examiner to gain allowance:

> Examiner suggested changing the language of "the wig grip apparatus lacks non-transparency beyond the forward periphery" since it was unclear as to what "lacks non-transparency" is and it was also unclear as to what was considered "beyond the forward periphery." Both Examiner and Applicant's representative agreed to change the limitation to state "the wig grip apparatus terminates at the forward periphery" to overcome the 112 rejection and to overcome the prior art of record and put the application in condition for allowance.

The prosecution history shows a clear and unequivocal surrender of any claim construction in which the forward edges of the adjacent straps and the mesh element might end at some position other than together at the front edge of the mesh. This is a prosecution history estoppel that precludes expansion under the guise of the Doctrine of Equivalents so as to encompass this surrendered subject

-19-

117329396.4

matter such as, e.g., for a mesh element whose forward and rear edges are set back from the forward and rearward edges of the adjacent straps. See, *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 734 (2002) ("Were it otherwise, the inventor might avoid the PTO's gatekeeping role and seek to recapture in an infringement action the very subject matter surrendered as a condition of receiving the patent.")

### d.  The Examiner's Reasons for Allowance Support CHD's Construction

The construction of the disputed clause was described by the examiner in the examiner's statement of reasons for allowance (Exh. 3 at NGI0013-14):

> The claims in the instant application have not been rejected using prior art because no references, or reasonable combination thereof could be found which disclose or suggest, "the mesh element includes a forward periphery extending form the first inboard portion to the second inboard portion; and the wig grip apparatus terminates at the forward periphery". The closest prior art of record appears to be Walsh (US 5,265,280). Walsh discloses a facial screen having a mesh element (24) connected to portion (20); however, Walsh does not disclose the mesh element including a forward periphery and that the forward periphery of the mesh terminates the apparatus.

NGI had expressed its intention to present an amended claim having the mesh and the securement members all extend to the same forward edge in its proposed Amendment of the interview Agenda for the July 21, 2020 interview F.

### e.  CHD's Proposed Construction Also Complies With The Doctrine Of Claim Differentiation

Claim 5 of the '159 Patent requires "a frontal segment" and "an opposing rearward edge" (which are not in claim 1) and that "the forward periphery is in alignment with the forward edges." Claim 5, as a whole, is of different scope than claim 1 and does not imply that CHD's proposed construction is erroneous. Again, CHD's proposed claim construction would apply here as the forward edges would not extend beyond the forward periphery.

-20-

### f. **NGI's Course of Dealing Supports CHD's Proposed Construction**

NGI's prior counsel did not assert literal infringement on the '159 claims in its earlier letter. The construction presented by NGI in its letter from Keener and Associates dated September 14, 2021 (CHD0039-43) asserts infringement only under the doctrine of equivalents (CHD0041). Such a position tacitly acknowledges that the Asserted Claims of the '159 patent require that the mesh element and the bands on either side much all terminate at the forward edge of the mesh.

## V. **CONCLUSION**

The prosecution history, specification, doctrine of claim differentiation, and NGI's course of dealing all support CHD's proposed claim construction that "the wig grip apparatus terminates at the forward periphery" should be construed to mean "the first securement member, second securement member, and mesh element all terminate at the forward periphery of the mesh element such that the securement members may not extend beyond the forward periphery of the mesh element." NGI's proposed construction would allow it to impermissibly recapture matter that was expressly disclaimed during prosecution in order to secure the patent.


Dated: May 23, 2022              LEWIS ROCA ROTHGERBER
                                 CHRISTIE LLP

                           By:   /s/Drew Wilson
                                 Drew Wilson
                                 Lance G. Johnson, Admitted *Pro Hac Vice*

                                 Attorneys for Defendant
                                 CREATEDHAIR DESIGNS, LLC

117329396.4